538 So.2d 422 (1989)
William P. (Bill) HUNT
v.
STATE of Mississippi.
No. 58149.
Supreme Court of Mississippi.
January 18, 1989.
James P. Coleman, Ackerman, for appellant.
Mike Moore, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and ANDERSON, JJ.
ANDERSON, Justice, for the Court:
This is an appeal by William (Bill) P. Hunt, who was convicted of murder in the *423 Circuit Court of Lafayette County (on change of venue from Lowndes County) and sentenced to serve a term of life imprisonment in the Mississippi Department of Corrections. We affirm.

I.

FACTS
On October 22, 1985, at approximately 12:30 A.M., Stephen Chobotor, who lived next door to Billy Jordan, was awakened by an "explosion" and a "flash of light." Approximately two minutes later, he heard the sound of "squealing tires." He looked out the window and saw a small, light colored car with the headlights off driving away from the area of Jordan's home.
Later that morning, Chobotor discovered Jordan's body in the driveway of Jordan's house. Officials subsequently determined that Jordan died from a shotgun slug wound to the left chest. During their investigation the officers found two business cards, one for Hunt and the other for Carolyn Forrester, on the floor inside the entrance door to the den of Jordan's home. According to Jordan's maid, the cards were not on the floor when she left the house at 12:00 noon on the previous day, October 21, 1985.
Forrester stated she knew Jordan but never had given him one of her business cards. Forrester testified that on the night of October 20, 1985, she met Hunt in a bar, gave him one of her cards, and saw him put it in his wallet with his own business card he had earlier shown her. Hunt told Forrester that he had "worked as a Private Investigator for him [Jordan], delivered large sums of money to the Sheriff for him, and that a lot of the apparent suicides in Columbus were not suicides, they were murders."
Gerry Nelson was the star witness for the state. He testified that he and Hunt had been friends for twenty years. When he returned home to Columbus, he and Hunt often got together, rode around in his car and drank. During these times Hunt confided in Nelson that he felt Jordan had taken advantage of one of his former girl-friends. Prior to the Jordan killing, Hunt told Nelson that he was "pretty pissed off" at Jordan because Jordan had not done all he could concerning some "criminal charges" pending against Hunt.
On Saturday, November 16, 1985, while riding around and drinking, Hunt bragged that he finally had taken care of Jordan. Hunt then instructed Nelson to turn down a deserted road surrounded by woods and to stop the car. Hunt got out of the car and entered the woods. When he came out of the woods in three or four minutes, he got back into Nelson's car holding a shotgun, and told Nelson, "This is the gun." Nelson recognized the gun as one he had seen several times at Hunt's home.
Hunt told Nelson that he went to Jordan's house late at night to try to rectify his problem regarding the charges against him. He took his shotgun, propped it against the wall of the house and knocked on the door. Jordan came to the door and when Hunt was sure Jordan was unarmed, he grabbed his shotgun, aimed it at Jordan, and told him to come outside to talk to him. Hunt then attempted to force Jordan three times to make a call to take care of his legal problems, but Jordan said "I'm sorry, Bill. I can't help you, but I will represent you." Hunt then said, "Good-bye, Jordan," and shot him. Hunt also told Nelson that he had slipped his girlfriend (Foster) a "mickey" so that she would pass out, if he needed an alibi.
On November 30, 1985, Hunt and Nelson went into the utility room of Hunt's parents' home where Hunt pointed to a bundle in the corner and told Nelson that it was the gun he had retrieved from the woods and that he needed to stash it somewhere because "there was some heat on." (The police had searched Hunt's residence twice prior to this date, but had not found the gun.) Although the gun already was wrapped in green plastic bags, they wrapped it further in other plastic garbage bags and taped it up with a strong, fabric-type tape.
Nelson then drove Hunt to a railroad crossing where Hunt hid the gun. When Hunt got back into the car, he told Nelson, "Remember a hundred sixty feet." (Investigating officers from the District Attorney's *424 office corroborated Nelson's testimony regarding the location of the shotgun.)
Nelson picked up Hunt in the early morning hours on the next day, December 1, 1985, and they went to the home of Arthur Mills. Hunt concocted a plan to get some money from Mills. Hunt got himself all wet and then told Mills he had an accident and needed help to pull his car out of a ditch. Nelson waited until shortly after he saw Hunt and Mills leave in Mills' truck. [These facts were corroborated by Mills' testimony.] Nelson returned and as Hunt entered the car he said, "I have fucked up." Hunt expressed the need to get his story straight because he was sure Mills "was going to press charges."
Nelson subsequently was charged in regard to the incident with Mills. He did not reveal information about Hunt and Jordan's killing to the police until December 10, 1985, after being charged. He testified that "Bill Hunt had gotten me in pretty deep with his problems and I didn't see no reason why he should drag me down with him."
On December 10, 1985, Nelson led officers to a point some 160 cross ties down a railroad track. There the officers found a package containing a twelve-gauge shotgun. The gun was sent to the crime lab in Jackson, Mississippi.
Since Nelson told the officers the gun had been wrapped and taped at Hunt's parents' home, it was searched by the police. Several rolls of tape similar to that on the package were located at the residence. Subsequently, an expert determined one of the rolls matched the tape which was wrapped around the gun recovered at the railroad track.
Further expert examination of the plastic bags revealed Hunt's fingerprints. The shotgun inside the package belonged to Hunt. Further expert examination and testing also led to the conclusion that the hull found with the shotgun was a rifle slug hull and had in fact been fired in that gun. Finally, the firearm expert testified that the wadding from the death scene came from the same brand and type of shell as that found with the shotgun.
Officer Michael Dulaney, testified for the State that on August 24, 1985, Hunt told him that he was "real pissed off" at Jordan because he had refused to get him out of jail. Hunt also told Dulaney that "[he] could kill [Jordan] just like this," as he snapped his fingers.
During Hunt's questioning on October 23 and 30, 1985, he gave officials a signed statement. On October 23, Hunt told officers that he had been "an associate" of Jordan since 1979. He and Jordan had a fight in August, 1985, but had since resolved their differences. The fight steemed from Hunt being angry with Jordan for not getting him out of jail on a D.U.I. charge. Hunt stated he had last been to Jordan's home some two to three weeks prior to October 22, 1985. Hunt also stated that he lived with Cindy Foster, his girlfriend; and that on Monday, October 21, 1985, he had spent the entire night with Foster at her apartment.
Foster testified that on Monday night prior to Jordan's murder, Hunt left the bed, fully dressed, and slept on the couch in the front room, and she did not see Hunt again until the next morning. Foster stated it was not unusual for Hunt to sleep on the couch. Foster could not testify, however, that Hunt had remained in the apartment the entire night. Foster testified that she owned a white Toyota Celica and Hunt had access to it, as well as the keys.
When officers questioned Hunt again on October 30, 1985, he stated that he never had given Jordan one of his business cards or talked to Jordan about insurance. Hunt also denied that he had a twelve gauge shot gun. Officers later discovered that Hunt owned such a gun, which he had received as a birthday gift from his father. During this statement, Hunt also gave the officers permission to take his fingerprints, which matched two latent prints lifted from Forrester's business card found in Jordan's home.
Patricia Powers, a resident of Memphis, testified that Nelson picked up Hunt from her home on November 16, 1985 (the date Hunt told Nelson of his "taking care of *425 Jordan"), and that they left Memphis at 9:50 P.M. This time of departure was contrary to an earlier time given by Nelson.
Hunt did not testify at trial in his own behalf.

II.

THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE CONVICTION.
Hunt attacks the credibility of the States's star witness, Nelson, who only offered information linking Hunt to Jordan's death after he had been arrested, and that his testimony contradicted other witnesses. The State first argues that Hunt should not be heard and is improperly before the Court because: (1) no issue regarding weight of evidence was assigned, and (2) no grounds were assigned in his motion for new trial that the judgment was against the overwhelming weight of the evidence.
The State explained Nelson's apprehension because Hunt had involved him in an incident which resulted in charges against him. Nelson cooperated with the State to aid in his own case. In regard to inconsistencies, Nelson was testifying as a witness to Hunt's rendition of Jordan's murder and not as an eye witness to it.
Before a conviction of any crime may stand, there must be in the record evidence sufficient to establish each element of the crime. Fisher v. State, 481 So.2d 203, 211 (Miss. 1985); Edwards v. State, 469 So.2d 68, 70 (Miss. 1985); Watson v. State, 465 So.2d 1025, 1031 (Miss. 1985).
On appeal, the Court's authority to interfere with the jury verdict is limited. The Court must proceed by considering all of the evidence in the light most consistent with the verdict. The standard applied in determining whether evidence is sufficient to support a jury verdict is that, in reviewing such evidence, all evidence supporting or tending to support the verdict, together with all inferences supportive of the verdict which may be drawn reasonably therefrom shall be taken as true. Aldridge v. State, 398 So.2d 1308, 1309 (Miss. 1981). See also, Lambert v. State, 462 So.2d 308 (Miss. 1984); Spikes v. State, 302 So.2d 250, 251 (Miss. 1974).
When ruling on the sufficiency of the evidence, the Court must bear in mind that the jury is the sole judge of the weight and credibility of the evidence, and that if all evidence on behalf of the State is taken as true, together with the reasonable inferences that may be drawn therefrom, and if there is sufficient evidence to support a verdict of guilty, this Court will not reverse. Fairley v. State, 467 So.2d 894, 904 (Miss. 1985) citing Goldman v. State, 406 So.2d 816 (Miss. 1981).
In Williams v. State, the Court stated: Where . .., the full facts and circumstances of the State's arrangements with its bounty hunter witness are disclosed to the jury and where that witness is subject to cross-examination, we will not disturb on this account a subsequent guilty verdict.
463 So.2d 1064, 1069 (Miss. 1985).
We will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice. Pharr v. State, 465 So.2d 294, 302 (Miss. 1984); Groseclose v. State, 440 So.2d 297, 300 (Miss. 1983).
We find the record and exhibits support the verdict and sentence of the trial court. Even though inconsistencies existed in the testimony, such conflicts were for the jury to resolve and not the duty of this Court. Accordingly, we find no merit to this assignment of error.

III.

DID HUNT SUFFER REVERSIBLE PREJUDICE BY CONTINUED AND REPEATED REFERENCES, AND THE ADMISSION OF SUCH REFERENCES, TO OTHER CRIMES FOR WHICH HUNT HAD NOT BEEN CONVICTED.
Hunt asserts that on numerous occasions throughout the trial references were made to Hunt's being an abusive user of alcohol and drugs, having been prosecuted *426 for driving under the influence of intoxicating beverages, having written a bad check and telling Mills that he had to get out of town.
Mississippi follows the general rule that in a criminal trial proof of a crime or acts distinct from that alleged on the indictment with respect to which the accused has not been convicted is inadmissible evidence against the accused. Davis v. State, 530 So.2d 694, 697-98 (Miss. 1988); Robinson v. State, 497 So.2d 440, 442 (Miss. 1986); Walker v. State, 473 So.2d 435, 442 (Miss. 1985); Tobias v. State, 472 So.2d 398, 400 (Miss. 1985); Hughes v. State, 470 So.2d 1046, 1048 (Miss. 1985). The rule precludes the State from raising the "forbidden inferential sequence," that the accused has committed other crimes and is therefore more likely to be guilty of the offense charged. Robinson at 442. Testimony regarding a separate and distinct offense, which has not resulted in a conviction requires reversal. See, Tobias, at 400; Hughes, supra.
Certain well-established exceptions exist, however, to the rule on the inadmissibility of other unconvicted crimes of an accused. Evidence of another offense is admissible when offered, not to show the accused's criminal tendencies, but instead to prove identity, knowledge, intent, common criminal scheme or plan, or absence of mistake, and where the defendant may "open the door" to evidences of other crimes or because the offense is so closely related to the crime charged as to form a single transaction or closely related series of transactions. MRE 404. See also Robinson at 442; Davis at 698; Tobias at 400; Eubanks v. State, 419 So.2d 1330, 1331 (Miss. 1982).
With the exception of writing a "bad check" and the Mills' testimony, the DUI and "other charges" were statements made by Hunt which showed a link between himself and Jordan, i.e., Hunt was dissatisfied with Jordan for not taking care of the matters in a way he perceived as "right." Thus, the testimony falls within the given exceptions. That is, the offenses showed "motive" since Hunt was dissatisfied with Jordan's help on his alleged legal matters.
The Court sustained Hunt's objection to the testimony about the writing of a "bad check," and instructed the jury to disregard the remarks. Where the trial court instructs the jury to disregard inadmissible comments or testimony, it is presumed that the jury will obey the instructions. Stringer v. State, 477 So.2d 1335, 1338 (Miss. 1985); Fairley v. State, 467 So.2d 894, 900 (Miss. 1985); Holifield v. State, 275 So.2d 851 (Miss. 1973), cert. dismissed, 414 U.S. 990, 94 S.Ct. 382, 38 L.Ed.2d 253 (1973).
Hunt also asserts that he was prejudiced by the introduction of the gruesome photographs of the dead body and the blood on the concrete driveway as evidence.
Admissibility of photographs rests with the sound discretion of the trial judge. McFee v. State, 511 So.2d 130, 134 (Miss. 1987); Kelly v. State, 463 So.2d 1070, 1074 (Miss. 1985). The lower court's judgment will not be reversed on the ground that photographs are gruesome and prejudicial, unless the lower court abuses its discretion. Koch v. State, 506 So.2d 269, 271 (Miss. 1987).
We find that the trial court did not abuse its discretion in admitting the photographs, as they aided the testimony the same as the diagrams of the murder scene which were admitted into evidence.
Accordingly, we find this assignment of error is without merit.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN and ZUCCARO, JJ., concur.
PITTMAN, J., not participating.