557 So.2d 542 (1990)
Gary Lynn GRIFFIN
v.
STATE of Mississippi.
No. 03-DP-0068.
Supreme Court of Mississippi.
February 14, 1990.
*543 Kenneth J. Rose, Jackson, L.F. Sams, Kay Trapp, Mitchell, McNutt, Bush, Lagrone & Sams, Tupelo, for appellant.
Mike Moore, Atty. Gen. by Marvin L. White, Jr., Asst. Atty. Gen., and Jeffery M. Rosamond, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.

ON PETITION FOR REHEARING
HAWKINS, Presiding Justice, for the Court:
The original opinion in this case is withdrawn and this opinion is substituted therefor.
Gary Lynn Griffin has appealed his conviction of capital murder of Russell Palmer in the circuit court of the Second Judicial District of Panola County, and sentence to death.
Because of prosecutorial misconduct (ROY NOBLE LEE, C.J., HAWKINS, P.J., and DAN M. LEE, P.J., dissenting) this cause is reversed. Our review of the trial *544 proceedings and assignments of error thereasto will be limited to those matters which will be faced on retrial, and those which the Court has concluded constitute reversible error.

FACTS
On Thursday, February 21, 1985, Russell Palmer, a World War II veteran of the U.S. Marine Corps, operated a country grocery store on the North side of Highway 6 about six miles East of Batesville. A road known as Belmont Road, just East of the store, ran North from Highway 6. Palmer and his wife had their residence near the store. Mrs. Palmer was employed as an x-ray technologist at the North Panola Hospital. Their children were grown; the couple lived by themselves.
Shortly before six that morning they arose and ate breakfast. Palmer left the house to go to the store shortly before seven. Mrs. Palmer remained at the house preparing to go to her job at the hospital. There was an intercom system between the house and the store, and she heard him open the store and later talk to a customer, who then left. She then heard a "commotion" over the intercom and ran to the store.
As she entered the store, not seeing her husband in his customary position, she started screaming for him. She then ran around the counter and saw Palmer, with the upper part of his head blown off.
Mrs. Palmer testified at trial that Palmer kept from two to three thousand dollars in cash in a large brown billfold attached to a chain. He did this to accommodate customers who needed their checks cashed in paying their bills.
Gary Lynn Griffin on that date was 25 years of age, married, the father of a two-year-old son, and worked as a laborer and truck driver for the Mississippi Forestry Commission. He also did janitorial work for a local attorney. In school he had completed the 11th grade.
Griffin owned a 1976 model four-door white Cadillac, with a "bunny" tag in front, and strips of metal above the headlights. A car of this description was reported to the local law enforcement officers as having been seen at the entrance to a gravel pit on Belmont road a short distance from Palmer's store.
When the officers went to the scene where the car had been parked, they concluded the wheels had been spun in leaving, and there was a deposit of transmission fluid on the ground.
The officers believed that Griffin's car had been used in some way in connection with the homicide, but Griffin was not considered a suspect initially. The car was found at Griffin's house, Griffin was located in Grenada County, and returned to Panola County to answer questions about the car.
Griffin told the officers no one else had used the car, and denied having any involvement in the homicide, himself.
The next day, February 22, he was transported to the Mississippi Highway Patrol headquarters in Jackson to take a polygraph examination. The test indicated Griffin was not telling the truth, and he was informed that the machine indicated he was lying. Griffin then made a full oral confession to Thomas L. McCloud, criminal investigator with the Mississippi Highway Patrol, and one of the officers investigating the crime. McCloud had been personally acquainted with Griffin for about two years.
The investigating party then returned to Batesville where Griffin's confession was reduced to writing by David M. Bryan, sheriff of Panola County. There is no contention on appeal that these confessions were not freely and voluntarily given, in accord with Griffin's constitutional rights.
The substance of Griffin's confession was that he had observed Palmer with a large billfold and a lot of money in a local coffee shop in Batesville. Griffin was in debt, had lost $800 betting on the Super Bowl, and decided to rob Palmer at his store. He borrowed a single-shot .16 gauge shotgun from an acquaintance, and took it, along with a .16 gauge slug to the store. When he got to the store, he turned off the highway and drove up the road to a *545 fence gap at the gravel pit and parked the car. He walked to the store, and went in the back door, which was unlocked. He hid beside the door. Palmer came in with his dog, and removed a revolver from his belt. The dog went to a bathroom, drank some water from a commode, and then went to Griffin. Griffin put his hand on the dog's head "and led him up towards the front" and the dog walked on up towards Palmer. Palmer let the dog out. Griffin started towards Palmer when a customer drove up, and Griffin returned to the back of the store. When the customer left, Griffin went behind the meat counter and behind Palmer according to the confession.
Mr. Palmer was reading the paper. I stood behind, trying to figure out what to do. He turned to spit in the garbage can and I moved back to the right and hid. When he turned back and started to read the paper, I walked up behind him and I had the gun  I had cocked the shotgun  I was going to knock him in the head with the barrel. I took the gun in both hands and swung down on him and the gun went off. I knew then that I had shot him. He went forward and then fell backwards. The billfold fell out and was lying between him and the cash register. I picked the billfold up and did not go in his pockets. After I picked the wallet up, I ran out the back door. I went running across the pasture towards my car. I got about half way to my car and I stopped running and started walking. I came out about twenty yards west of my car. I laid the gun and the money in the front seat. I took off in a hurry. When I got back to the Belmont Road, I turned north and crossed Highway Number 35 then went to the gravel road next to the Coke plant. I turned off and ran into the gravel road that runs parallel to Interstate 55. I turned right and got on the gravel road that comes back to Highway 51. While I was driving down the road, I took all the money out of the billfold. When I crossed the railroad track, I threw the billfold out of the passenger side window ...
The grand jury indicted Griffin for capital murder on February 28, in violation of Miss. Code Ann. § 97-3-19(2)(e). The indictment charged that Griffin did on February 21:
Feloniously, intentionally, and of his malice aforethought, kill and murder Russell Palmer, a human being, when he, the said GARY LYNN GRIFFIN, was engaged in the commission of the crime of Robbery, or an attempt to commit Robbery, in direct violation of Section 97-3-19(2)(e), Mississippi Code of 1972 Annotated, as amended;
Griffin was represented by Jack R. Jones, III, and James D. Franks, attorneys from DeSoto County. These attorneys filed 40 defense motions, among which were motions for a defense selected psychologist to examine Griffin, a motion for funds for the defense to employ an independent ballistics expert to support Griffin's claim the gun's firing was accidental, and a motion for funds to employ an independent investigator. The court overruled these motions.
There was a lengthy pretrial hearing on a motion to suppress Griffin's confession, following which the circuit judge overruled the motion. Griffin was examined by the staff at the Mississippi State Hospital in Whitfield and found competent to stand trial.
Trial began on Monday, October 21, and concluded Friday, October 25, 1985.
During the course of the trial, photographs of the scene of the homicide and Palmer, taken by McCloud, were introduced into evidence. Defense counsel objected to all pictures of Palmer as being irrelevant and inflammatory, which objections were overruled.
Wadding from the discharged shell was introduced into evidence, as was a piece of lead alloy found in a soft drink box, presumably the slug. McCloud also testified as to the path of the slug from the victim, through some pastries in a cake rack, and on into the soft drink machine.
Steve Byrd, a firearms expert with the Mississippi Highway Patrol, testified as to the firing mechanism on the shotgun. It was his opinion that, regardless of whether *546 the hammer was cocked or not, the weapon could not be fired without depressing the trigger.
Palmer's body was examined by Richard Graves Soper, a forensic pathologist. After describing the wounds about Palmer's head in considerable detail, he expressed the opinion that the muzzle of the shotgun was at intermediate range from the victim's head, eight-to-twelve feet. Dr. Soper was also shown photographs of the scene, the location of Palmer's spectacles, and what appeared to be blood and tissue several feet from the body, and asked if these photographs were consistent with his opinion Palmer had been shot at intermediate range.
No witnesses were offered by the defense during the guilt phase. At the conclusion of the guilt phase of the trial, defense counsel requested and were refused the following instruction:
INSTRUCTION NO. D-21
The Court instructs the jury that if you find from the evidence in this case beyond a reasonable doubt that
1. Russell Palmer was a living person and
2. he died as a result of the Defendant striking said decedent, Russell Palmer, with the shotgun causing it to discharge which was a cruel or unusual manner or by use of a dangerous weapon, and
3. the defendant, Gary Lynn Griffin, was acting in the heat of passion and
4. not in necessary self-defense, then you shall find the Defendant guilty of manslaughter.
If the State has failed to prove any one or more of these elements beyond a reasonable doubt then you shall find the Defendant not guilty.
We also excerpt from the record the instances which Griffin on appeal contends were prosecutorial misconduct in the trial.
During voir dire the prosecution asked the jury the following question:
Q. Do all of you understand that you prescribe the punishment and not administer it.
(Vol. V, p. 838)
There was an objection followed by an argument between counsel in chambers filling nine pages of the record. The court sustained the objection.
During opening statement the following took place:
ASSISTANT DISTRICT ATTORNEY (Mr. Buntin):
Mr. Palmer collapsed in his own store and this man stepped right over his warm body, his bleeding form, his prostrated body, and picked his wallet out of the blood, and ran like the coward he is, back to his car.
COUNSEL FOR THE DEFENSE (Mr. Franks):
Your Honor, we're going to object to the characterization of a coward or any other type of characterization. Now, Mr. Buntin knows that's not proper in opening argument, and we're going to object to it.
(Vol. VII, p. 1076)
Again, during opening statement the prosecution made the following observation to which there was no objection:
In fact, [Griffin] even tried to shift the blame over to his brother. You'll hear how he, as a matter of fact, plain out and out lied to save his skin and was  lied to law enforcement officers in order to deceive them and try to prevent from being linked to this brutal crime, and you'll hear and I believe the evidence will show, he lied again during his confession... .
(Vol. VII, p. 1080)
During closing argument in the guilt phase, the prosecution at various points made the following remarks:
The information goes to Sheriff Bryan and his fine and able staff, to Investigator McCloud and the fine law enforcement officers in the Highway Patrol. Those officers are at the crime scene. They're doing a thorough, professional job as thorough and professional as any job I've ever seen, and I can assure your, *547 Ladies and Gentlemen, I've seen plenty. They're working that crime scene with a fine-tooth comb....
(Vol. IX, p. 1478)
There was no objection made by the defense to this argument.
You know, crooks and thugs have got all the rights. You got to tell them they got the right to remain silent. You got to tell them that anything they say can be used against them. You got to tell them they got a right to a lawyer. You got to tell them if they ain't got money to hire a lawyer, the taxpayers will do it. You've got to do all that for the crooks and thugs... .
(Vol. IX, p. 1479)
There was no objection made by the defense to this argument.
The law recognizes that criminal Defendants often times don't tell the truth, the whole truth and nothing but the truth, so the law tells you, Ladies and Gentlemen, to disregard those parts of the confession that are untruthful, and to the extent that the facts tend to discredit that statement....
(Vol. IX, p. 1480)
There was no objection made by the defense to this argument.
"... After I picked it up, I ran, got to my car, laid the money and the gun on the front seat, went home, went to work." Now, he would have you believe that he accidentally did this, and that's what he wants to sell you; that's what he wants to sell you. He wants to sell you this and tell you that he accidentally did this. Now, Ladies and Gentlemen of the Jury, you don't have to have an expert to come in here and tell you that that is horse manure. You don't have to have a Pathologist to take that Stand, a man that's Phi Beta Kappa, graduated from Michigan, graduated from U.T., performed over six hundred autopsies; you don't have to have an expert to come in here and tell you that that's horse manure. All you've got to do is apply the acid test of reason. .. .
(Vol. IX, p. 1483)
There was no objection made by the defense to this argument.
DISTRICT ATTORNEY (Mr. Williams):
I suggest to you, Ladies and Gentlemen, when you apply the acid test of reason, when you look at the facts that have been proven, you can conclude but one thing, that we have proven him guilty as sin, guilty beyond a reasonable doubt of the crime of capital murder, of the crime of capital murder. We talk about the Defendant's rights, right to a free lawyer, right to this, right to that. I'm sick of it. What about these people? What rights have they got? You know they ain't got but one right. You know what right they've got? They got the right to expect and demand that people, honest people, will put on that badge of courage, that badge of citizenship and come in here and say to no-good ambush killer like that man 
COUNSEL FOR DEFENDANT (Mr. Franks):
Your Honor 
DISTRICT ATTORNEY (Mr. Williams):
 you ain't going to get away with it.
COUNSEL FOR DEFENDANT (Mr. Franks):
 that improper characterization. That's not called for.
THE COURT:
I'll sustain it at this point.
DISTRICT ATTORNEY (Mr. Williams):
I can't help it. I told you I was going to get wound up and I don't apologize for it because that's the way I feel. Your job right now, Ladies and Gentlemen, is to find him guilty and let's get on with it.
(Vol. IX, pp. 1485-86)
Again, during closing argument the prosecution made the following remarks:
Now, the Court has told you that you're not suppose to base your opinion on speculation or conjecture or what the lawyers try to tell you, you're suppose to base your decision on the facts that you heard from the Witness Stand. They tell you, there's one man alive today who can tell you what happened, and I agree with *548 that. There is one person who could tell us what happened and we have  we have a statement  we have a statement from him. We have a confession, an oral confession. We have a written confession, yes, we do. We ask you to consider the confession, we ask you to consider the statement, but its' just like anything else, Ladies and Gentlemen, it's subject to being true and it's subject to being false. I want you to think about this confession. I want you to think about this individual over here who committed this crime... .
(Vol. IX, p. 1506)
There was no objection made to this argument.
Finally, the prosecution concluded:
ASSISTANT DISTRICT ATTORNEY (Mr. Buntin):
Thank you, Your Honor. And, I was proud of Ms. Palmer when she was on the Stand and she had the courage to come in this room face-to-face with this person over here who had brutally murdered and robbed her husband and she had the courage and the backbone and the fortitude that it takes to go through a trial like this, to appear as a witness, to put herself and her family through what it takes. All of those people have done their job and as the Court and as Mr. Williams has told you, there are only twelve people on the face of this earth who can do justice in this case. You could have an army of investigators, you could have a bus load of witnesses, you could have evidence piled this high on this table, you could have the most learned Judge in the United States, you could have the most able lawyers that ever walked the face of this earth, but when it comes down to it, justice can only be done by the twelve people on this Jury. There'll be one day in Court for Ms. Palmer, for her family and for Mr. Palmer, one day, one decision. I submit to you that the proof has shown that there was a capital murder, that it was planned, that it was premeditated, that it was intentional, that it was committed during the course of a robbery. You've been told you have two options. I submit to you there are two verdicts that could be returned, but you have one duty. Your duty is to return a just verdict. I submit to you if you consider all the evidence, when you base your decision on what you heard from that Witness Stand, there is one just verdict. We ask you to return a verdict of guilty of capital murder. Let's put an end to this thing today.
(Vol. IX, pp. 1515-16)
No objection was made to this argument.
During her testimony Mrs. Palmer gave the date of her marriage to Palmer on October 17, 1945, that they had two grown sons living in Memphis, and that her husband was a World War II veteran of the Marine Corps. Mrs. Palmer, in relating the events following discovery of her husband's body, remarked that friends had carried her to the hospital. Also, over objections of the defense, a family photograph, showing Palmer, his children and grandchildren, was introduced into evidence. Griffin likewise argues on appeal that this line of questioning and the photograph were irrelevant and prejudicial.

LAW

PART I.

A. THE INDICTMENT
Although no demurrer or objection was made to the indictment at trial, Griffin argues on appeal that it gave him insufficient notice of the nature of the charge against him. The indictment was proper. Miss. Code Ann. § 97-3-19(2)(e); Caldwell v. State, 481 So.2d 850, 853 (Miss. 1984); Culberson v. State, 379 So.2d 499, 503 (Miss. 1979).

B. MANSLAUGHTER INSTRUCTION
Griffin also argues that he was entitled to a manslaughter instruction because in his confession he claimed he intended to strike Palmer over the head with the shotgun, and that in doing so it discharged. While this may or may not have had some *549 influence on a jury determining whether he should be sentenced to death or life imprisonment, it constitutes no legal entitlement whatever to a manslaughter instruction. This homicide having occurred during the course of a robbery, it was capital murder, regardless of the intent of Griffin.
Miss. Code Ann. § 97-3-19(2)(e) (1983) provides:
§ 97-3-19. Homicide; murder defined; capital murder.
* * * * * *
(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
* * * * * *
(e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies;
There is nothing about this statute which requires any intent to kill when a person is slain during the course of a robbery. It is no legal defense to claim accident, or that it was done without malice.
Miss. Code Ann. § 97-3-27 (1972), does indeed authorize a conviction of manslaughter only when a person is slain without malice during the commission of felonies generally. Specifically excluded, however, are certain felonies, one of which is robbery.
§ 97-3-27. Homicide  killing while committing felony.
The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony, except rape, burglary, arson, or robbery, or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.

C. GRUESOME PHOTOGRAPHS
During the testimony of Thomas McCloud, the highway patrol investigator, and during the testimony of Dr. Richard Soper, the pathologist, several photographs were introduced into evidence over the objection of the attorneys for Griffin. The photographs taken by McCloud depicted the condition of the deceased victim when and where the body was discovered. The photographs taken by Dr. Soper, before he performed the autopsy, depicted the exit wound created by the shotgun blast.
In both situations, attorneys for Griffin made contemporaneous objections. The basis for their objection was that the photos had no probative value and that the sole purpose of their introduction was to inflame and prejudice the jury against Griffin. (T-VII. 1172; VIII. 1413) In both cases the trial judge overruled their objections and allowed the photographs into evidence.
In the case of the photographs introduced during McCloud's testimony, the trial judge ruled that the State had "the right to show the details surrounding the commission of the crime and if they can do it with photographs, they have the right to do so." (T-VII. 1173) As to the autopsy photo introduced into evidence during the testimony of Dr. Soper, the district attorney successfully argued that it was probative in that it corroborated the finding made by Dr. Soper that the shot was fired from an intermediate range. (T-IX. 1417) Additionally, it further substantiated, and evidenced to the jury, his finding of no powder burns which would have been consistent with a shot fired at point blank range. (T-IX. 1425)
This Court has repeatedly held admissibility of photographs rests within the sound discretion of the trial judge. Hunt v. State, 538 So.2d 422 (1989); McFee v. State, 511 So.2d 130, 134 (Miss. 1987); Kelly v. State, 463 So.2d 1070, 1074 (Miss. 1985). Furthermore, the lower court's judgment will not be reversed on the ground that photographs are gruesome and prejudicial, unless the lower court has *550 abused its discretion. Hunt, supra; Koch v. State, 506 So.2d 269, 271 (Miss. 1987).
Moreover, in a slaying such as the instant case, in which the only eyewitness was the defendant, and it was argued that the slaying was something other than murder, the relevancy of photographs showing the scene and victim is increased. Photographs from different angles in such case are for a jury to evaluate.
Having said this we again caution prosecuting attorneys that there can be a limit both in the number of photographs and the manner in which they are displayed to the jury. The discretion we have afforded circuit judges is by no means unlimited, and we strongly urge that they curtail excess.
In this case there was no error in the admission of these photographs.
For the same reason it was competent for the pathologist to examine the photographs of the scene depicting the location of the blood, tissue and spectacles in relation to Palmer's body as a basis for his opinion that the shot was fired at intermediate range.

D. FUNDS FOR EXPERTS
Griffin's counsel showed no lack of initiative in pre-trial motions, among which were several requesting funds to employ experts and an investigator. On appeal, however, he only argues error in the denial of two such motions, the motion for an independent psychologist, and the motion for a "ballistics expert." His appeal makes no more than a generalized suggestion of how such experts could have benefitted him. The psychologist could have testified that Griffin "was under the influence of extreme mental or emotional disturbance," and that he "acted under extreme duress."
Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), is distinguishable. In this case the State offered no psychiatric testimony showing Griffin was a potential menace to society, and the defense did not plead insanity as a defense. Nixon v. State, 533 So.2d 1078, 1096-1097 (Miss. 1987). That a psychologist could testify a man heavily in debt, in ambushing and slaying another in order to rob him, did so under extreme pressure probably tells us nothing at all, but if so, no more than any jury would conclude, in any event. In addition, there was no specific showing as to the need for a psychologist or what he would testify. The only reason the State had for the slaying was that given by Griffin in his confession. Without Griffin testifying, what could a psychologist add to this? Where a defendant offers no more "than undeveloped assertions that the requested assistance would be beneficial," no trial court is under an obligation to provide him with fishing equipment. Caldwell v. Mississippi, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985); Johnson v. State, 529 So.2d 577, 593 (J. Dan Lee, dissenting).
In his brief, Griffin asserts the "ballistics expert" may have disputed the State's version that the weapon was fired at point-blank range with the victim. On appeal Griffin asserts a different reason for needing the ballistics expert than that given the circuit judge prior to trial. Griffin's counsel in their motion for this kind of expert stated that their reason was to show the shotgun "might not have been the gun that the casing and so forth came out of." (Vol. IV, pp. 625-629)
Griffin's stated need, prior to trial, for a ballistics expert was clearly nothing more than an expression of a fanciful hope that maybe, if the court furnished defense counsel with funds to employ a ballistics expert, just maybe, he would testify that the.16 gauge shotgun Griffin confessed as having been used in the slaying was not the weapon he used, after all. No court is required to order an expenditure of public funds on such an evanescent basis. Moreover, at trial there was no expert testimony directed to prove that this was the weapon in fact used, and there was no testimony from the defense that it was not the gun used.
On appeal, however, Griffin argues that such expert testimony could have supported his confession that the weapon fired when he struck Palmer with it, rather than blowing the top of head off at some eight-to-twelve feet distance. We answered a *551 similar contention in Ruffin v. State, 447 So.2d 113, 118-119 (Miss. 1984), in which defense counsel requested funds for an independent expert to examine blood, hair, and spermatozoa samples obtained by the State Crime Laboratory:
There is no merit in this assignment of error. That there can conceivably be instances when the state in fairness should be required to pay the cost of an expert needed by the defense to insure a fair trial for an indigent accused must be conceded. Those cases can only be left to the discretion of the trial court, and they will be rare. [citations omitted]
As aptly stated in Oregon v. Acosta, 41 Or. App. 257, 597 P.2d 1282, 1284 (1979):
It is apparent that an indigent's statutorily enacted right to defense expenses is not absolute, but is conditioned upon a showing that such expenses are needed to prepare and present an adequate defense. (Citations omitted) Neither the statute nor the constitutional guarantees of effective assistance of counsel and of equal protection require that an investigator or expert be furnished at public expense upon demand. (Citations omitted) There is no single test for determining whether the services of an investigator or an expert are necessary; that decision will depend on the facts and circumstances of the particular case and must be committed to the sound discretion of the court to which the request for expenses is directed. (Citations omitted) [Emphasis theirs]
See also, 34 A.L.R.3d 1256, §§ 7 through 17.
* * * * * *
The claim that the defendant needed money for an independent expert to examine these samples from the State Laboratory has a hollow ring. If such examination could have been of any possible benefit to Ruffin, it is inconceivable to this Court that diligent defense counsel would not somehow have raised the small sum necessary for such tests. Diligence and zeal of attorneys in our adversary system are commendable. In this case we must conclude the defense was not nearly as desirous of obtaining facts favorable to the defendant for presentation to the court and jury as to sandbag a trial court into reversible error by getting him to overrule the motion... .
447 So.2d at 118-119.
In this case the results defense counsel sought to obtain, whether this weapon could be fired, regardless of whether the hammer was cocked or uncocked, without pulling the trigger could have been ascertained at a modest expense. Aside from defense counsel, surely Griffin and his family could raise the $25 to $100 necessary to have some gunsmith examine this shotgun. See also, Johnson v. State, 529 So.2d 577, 592-593 (D. Lee, dissenting); Dufour v. State, 453 So.2d 337 (Miss. 1984); Tubbs v. State, 402 So.2d 830 (Miss. 1981); Bullock v. State, 391 So.2d 601 (Miss. 1980); Davis v. State, 374 So.2d 1293 (Miss. 1979).
PRATHER, Justice, for the Court:

PART II:

DID PROSECUTORIAL MISCONDUCT CONSTITUTE ERROR UNDER MISSISSIPPI AND FEDERAL LAW TO VIOLATE DEFENDANT'S RIGHT TO A FUNDAMENTALLY FAIR TRIAL?
Gary Lynn Griffin assigns as error necessitating reversal of both the guilt and sentence phases of this trial prosecutorial misconduct. It is Griffin's position that the instances of alleged misconduct were reversible when considered individually as well as for their cumulative effect. This Court addresses initially two of these assigned errors which have violated the established law of this State.
During the closing argument at the guilt/innocence phase of this trial, the following statement was made by defense counsel: "As we told you in pre-selection, there is only one person who can tell you if a reasonable doubt exists insofar as this case, and that's each and every one of you, when you look at all the evidence and not just part of it."
*552 The assistant prosecutor then countered during his rebuttal argument with a statement alleged to be in response to the above. The assistant prosecutor stated, "[T]hey tell you, there's one man alive today who can tell you what happened, and I agree with that. There is one person who could tell you what happened and we have  we have a statement  we have a statement from him. We have a confession, an oral confession, we have a written confession, yes, we do."
The defense asserts that the latter statement served as a comment on the defendant's exercise of his right not to testify. The State argues that the latter statement is in response to the former quoted statement above regarding existence of a reasonable doubt.
The constitutional requirement on this point has been repeated many times, but needs reiteration here.
In all criminal prosecutions the accused shall ... not be compelled to give evidence against himself; .. . Miss. Const. Art. 3, Sec. 25.
No person ... shall be compelled in any criminal case to be a witness against himself, ... U.S. Const. Am. 5. See also, Miss. Code Ann. section 13-1-9 (1972); Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).
This constitutional right has been construed by this Court to have been violated, not only when a direct statement is made by the prosecution as to the defendant's not testifying, but also by a comment which could reasonably be construed by a jury as a comment on the defendant's failure to testify. Jimpson v. State, 532 So.2d 985, 991 (Miss. 1988); Livingston v. State, 525 So.2d 1300, 1305-08 (Miss. 1988); Monroe v. State, 515 So.2d 860, 865 (Miss. 1987); Bridgeforth v. State, 498 So.2d 796, 798 (Miss. 1986); Wilson v. State, 433 So.2d 1142, 1146 (Miss. 1983); Davis v. State, 406 So.2d 795, 801 (Miss. 1981).
The State argues that the defense is now procedurally barred from claiming that the prosecutor commented on the defendant's failure to testify because no contemporaneous objection was ever made. This Court, however, has held that, even without a timely objection, reversal may be required when the prosecuting attorney has commented upon the defendant's right not to testify. Livingston v. State, 525 So.2d 1300, 1306-07 (Miss. 1988); Griffin v. State 504 So.2d 186, 193 (Miss. 1987); Stringer v. State, 500 So.2d 928, 940 (Miss. 1986); West v. State, 485 So.2d 681, 688 (Miss. 1985).
In this instance, this Court is of the opinion that the assistant prosecutor's remarks directed the jury's attention to the failure of the defendant to take the stand and admit or deny the contents of the confession and was a direct remark commenting on the defendant's exercise of his constitutional guarantee. In capital murder cases this Court has applied a heightened standard of review, e.g., Mease v. State, 539 So.2d 1324, 1336 (Miss. 1989), and has reversed where the defendant was not afforded a fundamentally fair trial, even if contemporaneous objection is lacking. See, Griffin, supra, at 193, and Stringer, supra, at 940. This error requires reversal of the guilt/innocence phase of this trial.
Griffin points to what he describes as "numerous instances of prosecutorial misconduct" which occurred at various stages and in various aspects: Attempts during voir dire to relieve jurors of their heavy responsibility in deciding a death penalty case; vilification of defendant during the opening statement by gratuitous remarks about blame-shifting by Griffin which were never proven during trial and conclusory opinion concerning Griffin's lack of truthfulness; improper and repeated references to the decedent Palmer and the impact of his death on his family; improper comments on Griffin's exercise of his right not to testify as well as his entitlement to the exercise of constitutional rights; comments vouching for the credibility of the State's witnesses; mischaracterizations of Griffin's confession and acts by offensive labeling; deliberate direct examination during the sentencing phase which suggested the possibility of parole of Griffin; improper questioning of a defense witness on a collateral matter involving another *553 death sentence individual; inflammatory closing argument which lacked evidentiary support.
Without detailing each and every one of these asserted improper prosecutorial acts, this Court holds that, as a whole, this defendant was not afforded a fundamentally fair trial. The one error of commenting on the defendant's failure to testify requires reversal of the entire case. However, even without that one reversible error, this Court is compelled to say that the cumulative effect of all of these assigned actions would require reversal. Stringer v. State, 500 So.2d 928, 939 (Miss. 1986); Hickson v. State, 472 So.2d 379, 385-86 (Miss. 1985); Barnes v. State, 460 So.2d 126, 135 (Miss. 1984); Williams v. State, 445 So.2d 798, 810 (Miss. 1984); Collins v. State, 408 So.2d 1376, 1380 (Miss. 1982); Russell v. State, 185 Miss. 464, 469, 189 So. 90, 91 (1939).
It is regrettable that the final disposition of this matter must be again delayed, and it is regrettable that the State and County must be put to the additional expense of a new trial, but this accused and any person charged with a crime, under the Constitution of this State, is entitled to be tried in a proceeding which is conducted by the prosecutor with dignity and propriety, free from name-calling, gratuitous insult and unnecessary inflammatory comment, repeated expressions of outrage, frequently recurring and transparent appeals to the emotions of jurors, and other such unacceptable conduct which this Court has repeatedly condemned. This Court cannot close its eyes to prosecutorial misconduct, condone it when it occurs, nor tolerate further recurrence.
In the front ranks of those who insist upon compliance with the law should always be found the attorneys whose duty it is to prosecute those who violate the law. When these officers fail to follow the law, the whole plan for the administration of justice fails. It is difficult if not impossible for a trial judge to assure an orderly fair trial without the cooperation of the prosecutor, and errors occur which this Court cannot ignore. Cases must then be reversed and sent back for a new trial, and this is true without regard to whether the accused is guilty or innocent. In such cases every one suffers, the county, the state, the accused, the family of the victim of the homicide, and the suffering is caused, not by the law, not by this Court, but by the failure of the prosecutor to be governed by the law.
The administration of criminal justice in this state and country must be improved. There is too much delay from trial to imposition of the sentence, whatever it may be. The answer is not to be found in disregarding the fundamental rights of persons accused. It is the recognition and preservation of fundamental constitutional rights which keeps our people free and makes our nation great. No person accused, however angry the people, however evil the crime, regardless of how strong the appearance of guilt, can be denied the full protection of the law and a fair and orderly trial, conducted with judicial decorum and dignity. This is especially true where the forfeiture of a human life is a possible result.
Rule 5.01 and Rule 5.12 of the Uniform Criminal Rules of Circuit Court Practice require that the attorneys for the state, as well as defense counsel, conduct themselves with dignity and decorum, treating the court, counsel, witnesses, and even the defendant, with professional respect. The prosecuting attorneys did not so conduct themselves in the trial of this case. The trial court is reminded that the rules require that no conduct interfering with or obstructing the administration of justice shall be tolerated. When prosecutorial misconduct in the courtroom requires the reversal of a case, that rule has been violated. Attorneys are required to "act in a fit, dignified, and courteous manner which will not degrade or interfere with the administration of justice." Rule 5.01 UCRCCP. There is no need for an announcement by the district attorney that he intends to "stomp" his feet and "holler."
So that there be no misunderstanding, this Court requires that all trials, civil and criminal, be conducted with dignity and decorum, and in an atmosphere of fundamental fairness in all respects and in every *554 phase of the proceedings. All counsel are admonished that this Court is entitled to and demands their full, sincere, and wholehearted cooperation to that end. Let it be finally and clearly understood that this Court will not suffer its requirements to be repeatedly disregarded with impunity.
The sentence of the defendant is vacated, and this cause is remanded to the Circuit Court of the Second Judicial District of Panola County for retrial of both guilt and sentence phases of this case.
REVERSED AND REMANDED FOR A NEW TRIAL.
As to Part I: ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, ANDERSON and BLASS, JJ., concur.
As to Part II: PRATHER, ROBERTSON, ANDERSON and BLASS, JJ., concur; HAWKINS, P.J., ROY NOBLE LEE, C.J., and DAN M. LEE, P.J., dissent.
SULLIVAN and PITTMAN, JJ., not participating.
HAWKINS, Presiding Justice, dissenting as to Part II:
I respectfully dissent.
The majority is reversing for an ambiguous statement which Griffin, for the first time on appeal, claims was a comment on his failure to testify. It did not occur to defense counsel that it was a comment on Griffin's failure to testify when made by the prosecuting attorney at trial, because there was no objection. Following the jury verdict on that same day, a judgment of conviction was entered on October 25, 1985. Thirty days later, defense counsel filed a motion for a new trial, alleging 33 grounds of error (Vol. XI, 1813-1818), which was thereafter amended to yet another ground. It still had not occurred to defense counsel that the remark was a comment on Griffin's failure to testify, because there was no hint of error suggested on this ground.
So let me be quite plain what this Court is saying to defense counsel in these capital murder cases. It does not matter how experienced a trial lawyer you are, you can sit in the trial and remain totally silent when an error is committed. You need not then object. Furthermore, when you have gone home, had time to study and reflect away from the heat of battle, and thereafter meticulously prepare the reasons to the circuit judge why you believe an error was committed during trial, you still need not raise the question before the trial court. You may supinely relax with the assurance that this Court will nevertheless take care of your client on appeal.
Is it actually possible for this Court to believe that these two defense attorneys, both with experience defending capital murder cases, thought for one second, one fleeting second, that this remark by the prosecuting attorney was a comment on Griffin's failure to testify? If they had they most certainly would have raised it either at trial or in the motion for a new trial.
Yet here we are taking a cold record and the fertile imagination of counsel representing Griffin on appeal and hold this ambiguous statement a direct comment on Griffin's failure to testify.
The prosecuting attorney told the jury that there was one man alive who could tell what happened, and they had a statement from him. They had one oral confession, and they had a written confession.
The jury could have interpreted that one of two ways: (1) Griffin was the only person who could tell them what happened and he had, both by oral confession and a written confession.
How astonishing it is that the majority, with a perception bordering on miraculous, can look at a cold record and asseverate that the prosecuting attorney made "a direct remark commenting on the defendant's exercise of his constitutional guarantee."
In Lee v. State, 435 So.2d 674, 677 (Miss. 1983), a case in which the defendants did not testify, not once but four times the district attorney told the jury it was undisputed that the defendants possessed the drugs. There was an objection and a motion *555 for a mistrial, all overruled. Of course, these were blatant comments upon the defendant's failure to testify, which had we followed precedent, would have compelled reversal. Wilson v. State, 433 So.2d 1142 (Miss. 1983); Peterson v. State, 357 So.2d 113 (Miss. 1978); Brown v. State, 340 So.2d 718 (Miss. 1976); Clark v. State, 260 So.2d 445 (Miss. 1972); Prince v. State, 93 Miss. 263, 46 So. 537 (1908); Smith v. State, 87 Miss. 627, 40 So. 229 (Miss. 1906); Hoff v. State, 83 Miss. 488, 35 So. 950 (1903). Yet, this Court held these comments, if error, did not "constitute reversible error" (Hawkins, dissenting).
In Jackson v. State, 440 So.2d 307, 310 (Miss. 1983), we conceded that "While the closing remarks by the district attorney may be considered as insinuating that Jackson did not testify, there was no direct comment upon his failure to testify, and we do not think that the remarks constituted reversible error." We affirmed (Hawkins, specially concurring in view of Lee v. State), despite our previous holding in Wilson v. State, 433 So.2d 1142, 1146 (Miss. 1983), that "District attorneys must not directly, or by innuendo or insinuation, comment on a defendant's not testifying."
Along came Russell v. State, 506 So.2d 974, 976 (Miss. 1987), in which the district attorney told the jury all they had left was the testimony of the two little girls, their mother and the police officer. Objection and motion for a mistrial were made, both overruled. Upon appeal we found the district attorney had not "intended" for his comment to be so construed, and that the statement was insufficient to deny the defendant a "fundamentally fair trial."
In Monroe v. State, 515 So.2d 860 (Miss. 1987), the defendant Monroe did not testify. His accomplice Jones had been previously tried, and did not testify at his own trial. Jones, however, did testify on Monroe's behalf. The district attorney went after Jones with hammer and tongs for his failure to testify when he, himself was on trial. The district attorney let the jury know in unmistakable language that if he, Jones, were innocent, why had he not testified in his own case. This Court did not think this constituted a comment upon Monroe's failure to testify and was proper cross-examination (Hawkins, concurring in result because there had been no objection).
I cannot conceive anyone reading these cited cases and come to any other conclusion but that the district attorney, whether he intended to or not  and most of the time he intended to  was calling it to the attention of the jury that the accused was not testifying in that case. Yet we affirmed.
Here we are taking what clearly was an ambiguous statement, which only by stretching can any unfavorable inference be drawn, and say it was a direct comment upon Griffin's failure to testify. If it was, how come Griffin's two defense counsel never discovered this plain error? It only occurred to ingenious appellate counsel, who never attended the trial, and this Court has bought the argument hook, line and sinker.
There is another disturbing aspect: the majority's vacillation on this important constitutional right. As can be seen from the above decisions in cases constituting clear and obvious violations of an accused's right to remain silent, we swallowed a camel and affirmed. Now the majority gags on a gnat and reverses. Also see Shook v. State, 552 So.2d 841 (Miss. 1989), D. Lee dissenting, for a much worse transgression, duly objected to, in which this Court affirmed.
Moreover, if there ever was a case of an error being waived, this is the case. Defense counsel neither objected at trial nor raised the point in the motion for a new trial. Hill v. State, 432 So.2d 427 (Miss. 1983).

MOTHER HUBBARD
Finally, the majority lists a litany of prosecutorial sins and then tells the prosecution, "Without detailing each and every one of these asserted improper prosecutorial acts, this Court holds that as a whole, this defendant was not afforded a fundamentally fair trial." Although reversing for the one error of commenting upon the defendant's failure to testify, the majority tells us the "cumulative effect of all of *556 these assigned actions would require reversal." (Majority Opinion, p. 553)
The majority then gives us an excellent generalized lecture on the duties of a prosecutor to conduct the trial:
"... free from name-calling, gratuitous insult and unnecessary inflammatory comment, repeated expressions of outrage, frequently recurring and transparent appeals to the emotions of jurors," etc. [Emphasis added]
I have two complaints about the majority's comments. First, if the majority deems the prosecution has committed reversible error in its conduct, it should tell it why, and be specific, and cite specific authority.
I will be specific as to what I do find objectionable.
The statement of the prosecution to the jury on voir dire that it prescribed punishment but did not administer it, to which the circuit judge sustained an objection, while irrelevant, perhaps, could hardly be classified as prejudicial. Everyone did understand, of course, that the jury did not administer the punishment.
An opening statement should be confined to a bare statement of the actual facts which each side proposed to submit into evidence, and not adjectives or characterizations. Unif.Crim.R.Cir.Ct.Prac. 5.11; Woodward v. State, 533 So.2d 418 (Miss. 1988). See also, Crenshaw v. State, 513 So.2d 898 (Miss. 1987). Also, neither side should make a statement of some alleged fact about which no proof thereafter is offered. Hosford v. State, 525 So.2d 789 (Miss. 1988).
The State erred in both these respects in its opening statement, but there was only one objection, sustained by the Court. Nonetheless, when one looks at the overwhelming evidence offered during the guilt phase of this trial, it is mentally impossible to conceive that if these remarks had not been made during the opening statement of this five-day trial that would have made some difference in the verdict returned.
Likewise, in my view the prosecution in closing argument should not have complained as to "crooks and thugs" having "all the rights," and the "taxpayers" pay for their attorneys, and his being "sick of it."
Secondly, I see no reversible error, or indeed any serious error, in the closing argument made by the prosecution during the guilt phase. In my view this Court should be wary in condemning argument by either side in a lawsuit. It is not a matter of good taste, or personal preference as to behavior by members of this Court. Rather, it is a matter of granting the widest possible latitude in an adversary system. The object of our system of justice is to permit a full flowering of each side as adversaries. A lawyer is entitled to be himself, his own man, before the trial court and jury, and when we take it upon ourselves to crimp his style, we are doing something dangerous. Monk v. State, 532 So.2d 592 (Miss. 1988); Neal v. State, 451 So.2d 743, 762 (Miss. 1984). In Johnson v. State, 416 So.2d 383 (Miss. 1982), we had a circuit judge preventing defense counsel from arguing his own case. I dissented. Johnson, supra, 416 So.2d at 393. Now, we have a hovering Court, years and many miles' distance from the heat of battle sanctimouniously doing the same to the prosecution. Members of this Court as prosecutors would have argued this case differently, and many no doubt better. That is not the point, however. None of us was employed by the State to prosecute.[1]
Moreover, the majority does it by a broadside.
For my part, I find the majority's broadside objectionable. There is no way any prosecuting attorney can read it and determine what he can and cannot do. It is a generalized choke strap.
What is wrong with the State expressing outrage at this crime? The proof is undisputed. *557 Russell Palmer was a man who had never harmed or mistreated Griffin in any way.
In order to get himself out of a temporary financial bind  most of it a loss on a football bet  Griffin in his own evil thinking made a plan to rob and murder a peaceful, harmless man. With a loaded shotgun he slipped into the back of Palmer's store and waited. When Palmer opened his store, Griffin crept up behind him, and without giving Palmer a whisper of warning  not a dog's chance  blew his head off with the shotgun.
The jury was fully warranted in believing that it took the coldest-blooded person to commit this act; that it took a coward; that it took a man who had no care in the world for a fellow human being.
The indisputed proof showed this to be a cold-blooded cowardly, grisly murder.
No words by a prosecuting attorney could add to the eloquent horror of this act. In my view there was nothing wrong in the district attorney speaking plainly to average citizens of Panola County.
I do not question that prosecuting attorneys may indeed engage in prosecutorial misconduct in such degree as to warrant reversal of a conviction, and that it may come about in various ways. Hosford v. State, supra, 525 So.2d at 789. A balanced judgment should make this determination, however. In my view there is less danger to the fair administration of criminal justice from possible wayward arguments to jurors by trial attorneys than unwarranted interference by an appellate court.

NO OBJECTION
Finally, there was no objection to any of the closing argument. We have repeatedly held that "If no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case." Cole v. State, 525 So.2d 365, 369 (Miss. 1987); Irving v. State, 498 So.2d 305 (Miss. 1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); Johnson v. State, 477 So.2d 196 (Miss. 1985), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986); In re Hill, 460 So.2d 792 (Miss. 1984); Hill v. State, 432 So.2d 427 (Miss. 1983), cert. denied, 464 U.S. 977, 104 S.Ct. 414, 78 L.Ed.2d 352 (1983). Again, the majority is telling defense counsel there is no need to make any objection whatever during trial to an argument. Just wait until you get to this Court on appeal. There is an excellent reason for the rule requiring an attorney to object when improper argument is made. This gives the circuit judge an opportunity to correct it, if it needs correcting, and thus avoid error. Gray v. State, 487 So.2d 1304, 1312 (Miss. 1986); Baker v. State, 327 So.2d 288, 292-93 (Miss. 1976).
I therefore dissent.
ROY NOBLE LEE, C.J., and DAN M. LEE, P.J., join this opinion.
NOTES
[1] This hamstringing of lawyers' arguments by a trial judge reminds me of an actual case. One of the lawyers in closing argument was illustrating a point with a parable from the New Testament. Opposing counsel stood up and objected to "counsel's injecting religion into this case." The circuit judge sustained the objection!