BARNES, J.,
for the Court.
¶ 1. Gary Sacus was convicted of manslaughter in the Circuit Court of Monroe County and sentenced to a term of twenty years in the custody of the Mississippi Department of Corrections. Sacus appeals to this Court, claiming (1) the trial court erred in failing to grant his motion for judgment for acquittal notwithstanding the verdict (“JNOV”) or, in the alternative, a new trial and (2) the trial court erred in allowing testimony that Sacus refused to give a recorded or written statement. Finding no error, we affirm his conviction.
SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. On the afternoon of March 13, 2004, at a park in Aberdeen, Mississippi, Gary Sacus participated in a game of pick-up basketball with David Springer, Joe L. McMillian, and Frank Earl Gladney, Jr. Sacus and Springer played against McMil-lian and Gladney. The players decided to wager $100 each on the game for a total pot of $400. The cash was held by a third party at the park. During the game, an altercation arose. Sacus decided to quit playing while his side was losing, and the game ended. An argument began over the return of the wagered money. Sacus and McMillian started to fight. Sacus subsequently left the park without the return of his wagered money. Several witnesses testified that he was angry at this time. Sacus said he went from the park to his mother’s gravesite, and then drove to the West Point Wal-Mart and made some purchases. From there Sacus drove to Columbus where he purchased a handgun from Gary’s Pawn & Gun. According to security videotape, Sacus left the pawn shop at approximately 5:13 p.m.; he returned to Aberdeen.
*332 ¶ 3. While driving around Aberdeen, Sa-cus was stopped in his vehicle by Frank Gladney and Forrard McMillian, Joe McMillian’s cousin, who were also in a vehicle. Forrard testified that Sacus and Gladney proceeded to talk about the wagered money. Forrard also testified that Sacus “seemed upset” and told Gladney, “I want my money.” However, Sacus testified that he was merely on his way home when they stopped him, and it was Glad-ney who “was cussing about the money.” Forrard and Gladney then went to the apartment of an acquaintance, Tonique Wilson, who had several guests at her apartment. Sacus knew Wilson as well and arrived in front of her apartment. Testimony conflicts about whether Sacus entered Wilson’s apartment looking for Gladney; however, it is uneontested that Gladney went outside Wilson’s apartment prepared for an altercation with Sacus over the money wagered on the basketball game.
¶4. It is undisputed that what transpired next was that Sacus and Gladney had words about the wager, engaged in a tussle, and Sacus shot Frank Gladney, who was unarmed, three times with the newly purchased gun. Sacus then left the scene and began driving to his home nearby. His family, who had heard about the shooting by this time, got in their car and intercepted him. Shortly thereafter, escorted by his family, Sacus turned himself in to the Aberdeen police. Frank Earl Gladney Jr. was pronounced dead upon arrival at the hospital in Aberdeen at 6:22 p.m.
¶ 5. Back at the Aberdeen police station, at 6:19 p.m., Officer Quinell Shumpert read Sacus his Miranda rights. Sacus told Officer Shumpert he would cooperate and talk to him; however, he insisted he did not want his statement tape recorded, nor would he write out his own statement and sign it. Further, Sacus refused to sign a “Waiver of Rights” form.[1] However, as Officer Shumpert began his interview it was interrupted by a call from the hospital advising Officer Shumpert that Frank Gladney was deceased. Officer Shumpert stopped the interview and went to the hospital to obtain statements.
¶ 6. Upon the resumption of their interview, Sacus gave his oral statement about the shooting to Officer Shumpert. He spoke of the basketball game and the wager. Sacus stated that Gladney came outside in front of Wilson’s apartment with a beer bottle. They proceeded to get in an altercation about the wager money. Sacus then stated that Gladney attacked him so he grabbed his gun from the driver’s seat and shot Gladney, implying his actions were in self-defense. When Officer Shum-pert asked Sacus “who rides around town with a gun sitting in the driver’s seat?” Sacus began to cry and invoked his right to remain silent.
¶ 7. On September 8, 2004, Gary Sacus was indicted by a Monroe County grand jury for murder. Sacus’s three day trial commenced on March 1, 2005, in the Circuit Court of Monroe County. During the State’s opening statement, reference was made to Sacus’s refusal to tape record or sign a written statement, and his invocation of his right to remain silent. Thus, after opening statements, Sacus’s counsel moved to exclude any reference or testimony regarding that point during the interview when Sacus invoked his Miranda rights. Defense counsel acknowledged that while Sacus waived his Fifth Amendment rights regarding what he said during his *333 oral statement to Officer Shumpert, any comment on Sacus’s invocation of his right to remain silent would be unconstitutional. The trial judge granted the defense’s motion in limine “to the extent that there should be no statement or discussion or question or inference with respect to the defendant’s right to assert his silence.”
¶ 8. During the State’s case-in-chief, twelve witnesses were called to the stand, most of whom were in the vicinity of the shooting and knew the victim and defendant. Several witnesses heard the gunshots, but only Forrard McMillian claimed to be an eyewitness to the entire shooting, having watched from the window of Wilson’s apartment. He testified that Sacus initiated the fight with Gladney, then retrieved the gun from his car, told Gladney he wanted his money, and shot him one time, at which point Gladney offered to get Sacus’s money. Then, Forrard testified that Gladney, upon rising, rushed Sacus in a supposed measure of self-defense, they tussled over the gun, and then Gladney was shot two more times. Tonique Wilson and Virginia White, who was the victim’s girlfriend, corroborated parts of this testimony. Several of the State’s witnesses also testified that as Sacus left the scene, he threatened that Joe L. McMillian would be “next.”
¶ 9. Officer Shumpert was the last of the State’s witnesses to testify. On the stand, Officer Shumpert recounted his interview with Sacus on March 13. When he came to the point in his testimony where he said “I ... advised Mr. Sacus of his rights,” the prosecuting attorney stopped the officer’s testimony. A conference then ensued between the judge and both counsel outside of the hearing of the court reporter, after which the State proceeded to introduce Sacus’s waiver of rights form. The judge noted a continuing objection by defense counsel over the introduction of the form. As the examination of Officer Shumpert resumed, the State elicited testimony that Sacus refused to give a tape recorded or written statement. Officer Shumpert then described their interview until the moment Sacus invoked his right to remain silent. No further testimony was elicited from Officer Shumpert as to why the interview stopped. At the close of the State’s casein-chief, defense counsel reiterated his continuing objection to Officer Shumpert’s testimony regarding Sacus’s refusal to write or tape record his statement or have it tape recorded. Defense counsel argued that this, too, was a comment on Sacus’s constitutional right to remain silent. The judge overruled the objection.
¶ 10. Next, defense counsel moved for a directed verdict, claiming the State had failed to prove Sacus acted with malice, the essential element of murder, to a reasonable-minded jury beyond a reasonable doubt. The judge denied the motion, and the defense proceeded with its case. Defense witnesses included two of Sacus’s sisters and Sacus himself. On the stand, Sacus gave his own version of the shooting. He testified that Gladney came out of Wilson’s apartment cursing and wielding a beer bottle. When Sacus attempted to get out of his vehicle, he claimed Gladney shoved him against the door. Supposedly fearing for his safety, Sacus retrieved his newly purchased gun from the front seat, at which time he and Gladney tussled over it. Sacus claims he then unintentionally shot Gladney.
¶ 11. At the end of the three day trial, the jurors were provided with instructions on both murder and manslaughter. The jury rejected the charge of murder and returned a verdict of guilty for the lesser offense of manslaughter. The trial judge sentenced Sacus to twenty years in the custody of the Mississippi Department of Corrections. Additionally, she assessed *334 Sacus a fine of $5,000, and further, required him to pay the following: $500 to the Mississippi Crime Victims’ Compensation Fund, $7,200 to the Gladney family as restitution for the funeral costs of the victim, and the court costs of the proceeding. Sacus filed a motion for JNOV or, in the alternative, a new trial. The trial court denied the motion, and Sacus perfected his appeal.
ISSUES AND ANALYSIS
I. WHETHER THE TRIAL COURT ERRED IN FAILING TO GRANT SACUS’S MOTION FOR JNOV OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL.
¶ 12. A motion for JNOV challenges the sufficiency of the evidence presented to the jury. McClain v. State, 625 So.2d 774, 778 (Miss.1993). “[T]he critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed.’ ” Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss.2005) (quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)). This Court’s standard of review is to analyze “the evidence in the light most favorable to the prosecution, [and decide if] any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (citations omitted). The appellee receives “the benefit of all favorable inferences that may be reasonably drawn from the evidence.” McClendon v. State, 852 So.2d 43, 47(¶ 11) (Miss.Ct.App.2002) (citing Baker v. State, 802 So.2d 77, 81(¶ 13) (Miss.1995)). Furthermore, all credible evidence supporting the verdict will be accepted as true. Walker v. State, 881 So.2d 820, 831(¶ 32) (Miss.2004). This Court will reverse on the issue of legal sufficiency of the evidence when the facts favor the appellant to such an extent that “reasonable men could not have found appellant guilty.” McClendon, 852 So.2d at 47(¶ 11). However, this Court is required to affirm the judgment of the trial court on the sufficiency of the evidence “where substantial evidence of such quality and weight exists to support the verdict and where reasonable and fair minded jurors may have found appellant guilty.” Id.
¶ 13. Alternatively, unlike a motion for JNOV, a motion for a new trial challenges the weight, not the sufficiency, of the evidence. Purnell v. State, 878 So.2d 124, 129(¶18) (Miss.Ct.App.2004) (citing Smith v. State, 802 So.2d 82, 85-86 (Miss.2001)). This Court will review the trial court’s denial of a motion for a new trial under an abuse of discretion standard. Johnson v. State, 904 So.2d 162, 167(¶ 11) (Miss.2005). This Court “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush v. State, 895 So.2d 836, 844(¶ 18) (Miss.2005) (citing Herring v. State, 691 So.2d 948, 957 (Miss.1997)). The evidence will be analyzed “in the light most favorable to the verdict.” Id.
¶ 14. In our case, the jury was instructed that if the State failed to prove one or more of the elements of the crime of murder, they could proceed in their deliberations to decide if Sacus was guilty of manslaughter. The jurors were told that for a conviction of manslaughter they must find evidence beyond a reasonable doubt that Sacus “did wilfully, unlawfully and felo-niously, without authority of law, kill and slay Frank Earl Gladney, Jr., without malice aforethought, in the heat of passion, by use of a deadly weapon, and not in necessary self defense.” The jury was also instructed that if they found the killing of Gladney “committed by accident and mis *335 fortune, in the heat of passion upon any sudden and sufficient provocation,” then they must acquit Sacus.
¶ 15. Sacus argues that the trial court erred in denying his motion for JNOV or, in the alternative, a new trial. Specifically, Sacus contends that, even though he was charged and tried for murder, the jury had insufficient evidence to find him guilty of the lesser offense of manslaughter. Sacus argues that there was no testimony that he was still angry at Gladney at the time he bought the hand gun, thus evidence of the purchase of the hand gun which ultimately killed Frank Gladney was irrelevant. Nor did he know Gladney had his $100, but had decided to keep $50. The testimony of the State’s key witness, Forrard McMillian, the only self-proclaimed eyewitness to the entire shooting, Sacus claims is rendered implausible because it conflicts with testimony of two other witnesses. Sacus also argues that testimony of Tonique Wilson, who claimed to see the two men tussling after she heard the first shot, renders Forrard’s testimony implausible. Thus, the defense contends that the only credible version of the events leading to the tragic shooting is from the defendant himself, who claims the shooting was oddly both an accident and in self-defense. Finally, regarding the weight of the evidence, Sacus maintains that a reasonable and fair-minded jury could not find the State proved, beyond a reasonable doubt, the element of willfulness as required for a conviction of manslaughter, when the evidence so profoundly points to a shooting of accident and misfortune.
¶ 16. After a thorough review of the record, we find that the trial court did not err in denying Sacus’s motion for JNOV or alternatively a new trial. Further, as the State points out in its brief, defense counsel did not renew his motion for a directed verdict originally made at the end of the State’s case-in-chief. The motion for a directed verdict is cited in the JNOV motion. In order to preserve for appeal the trial court’s denial of a directed verdict, the motion must be renewed at the end of the defense’s case, or a peremptory instruction should be requested. Green v. State, 631 So.2d 167, 171 (Miss.1994) (citing Roberts v. State, 582 So.2d 423, 424 n. 1 (Miss.1991)). Since neither of these actions were performed, any claim of error regarding denial of a directed verdict is procedurally barred.
¶ 17. In analyzing the evidence in the light most favorable to the State, we find there was sufficient evidence to convict Sacus of manslaughter. The evidence presented at trial proves that Sacus had the willful intent necessary for manslaughter. While trial testimony conflicts about certain details, it is the province of the jury to resolve these conflicts and decide which witnesses are credible. Jones v. State, 920 So.2d 465, 472-73(¶22) (Miss.2006) (citing Jackson v. State, 614 So.2d 965, 972 (Miss.1993)). Several witnesses testified that Sacus was angry that his $100 wager had not been returned. The purchase of the gun in Columbus, even if coincidental, contributed to Sacus’s wilful intent. Many witnesses saw Sacus and the victim arguing before the shooting. The evidence is undisputed that Sacus unnecessarily introduced a deadly weapon into a disagreement, with tragic results. Furthermore, it is hard to fathom how a victim could be “accidentally” shot not once, but three times. The jury rejected the theory that the killing was by accident and misfortune. It also rejected the theory that Sacus killed Gladney with “malice aforethought,” the intent necessary for a murder conviction. In light of the evidence, we find any rational juror could have found beyond a reasonable doubt that the State *336 proved all the elements of manslaughter. Regarding the weight of the evidence presented at trial to support a guilty verdict, this Court finds it substantial. Allowing Sacus’s conviction to stand would not sanction an unconscionable injustice. Thus, the trial court did not err in denying Sa-cus’s motion for JNOV or a new trial. This issue is without merit.
II. WHETHER THE TRIAL COURT ERRED IN ALLOWING OFFICER SHUMPERT TO TESTIFY THAT SACUS REFUSED TO GIVE A RECORDED OR WRITTEN STATEMENT.
¶ 18. During the State’s opening statement, the prosecutor made a comment that Sacus refused to give the Aberdeen police a written or recorded statement, and that when he was asked “who rides around with a loaded gun right there in the seat of their car?” Sacus started crying and did not want to talk anymore. After opening statements, defense counsel stated:
an inference was thrown out for the jury that [Sacus] got to a point and things got sticky and so he decided to be silent. He has a right to be silent, and any comment on that right to be silent is unconstitutional. So we would ask that the prosecution not refer to that, that Major Shumpert not refer to that when he recites Mr. Sacus’ oral statement. Mr. Sacus waived his right to the point of what he said. Past that point, he exercised his Fifth Amendment privilege, and we say that that has to be without comment.
The judge granted Sacus’s motion in li-mine, which was made after opening statements, to the extent the State must not mention or make inferences to Sacus’s assertion of his right to remain silent. During Officer Shumpert’s testimony, defense counsel also objected to the introduction of the waiver of rights form. He made a “continuing objection into the record to both the document and the testimony that we referred to at the bench, and I’ll fill that out more during recess.” Then, during the recess, defense counsel stated for the record his objection was regarding any comment on Sacus’s refusal to record or write his statement, which is different from his original objection to mentioning the point at which Sacus invoked his right to remain silent. The judge overruled Sa-cus’s objection, responding that “[t]he remedy suggested at the bench was identification of that Miranda rights statement but not introduction of that statement, and ... it indeed was not introduced.” (Emphasis added).
¶ 19. On appeal, Sacus argues that the exercise of his right to remain silent would also include his right to refuse to record or write his statement-a statement which he orally gave to the police. Sacus argues that the questions elicited from Officer Shumpert on direct examination by the State violated the prior motion in limine agreed upon by both parties after opening statements in order to purposefully prejudice the defendant. Further, Sa-cus argues this tactic was an intentional violation of his rights under the Fifth Amendment of the U.S. Constitution and article 3, section 26 of the Mississippi Constitution.[2] Sacus cites Griffin v. State, 557 So.2d 542 (Miss.1990), for the proposition that the prejudice resulting from the admission of his refusal to write or record a *337 statement casts doubt on the truthfulness of his statement. Id.
¶20. We find Sacus’s argument unpersuasive. The motion in limine properly concerned only the invocation of Sa-cus’s right to remain silent, not his refusal to write or record a statement before he invoked this right. A refusal to write or record a statement which is ultimately given to police orally is not equivalent to an invocation of one’s Fifth Amendment rights. During trial, the State’s examination of Officer Shumpert properly stopped at the point of the interview where Sacus invoked his right to remain silent and went no further. Officer Shumpert’s testimony about Sacus’s refusal to write or record a statement was merely a part of the preceding police interview. Sacus waived his privilege to remain silent regarding his refusal to make a written or recorded statement. He gave an oral statement to police, not to mention testifying at trial. Additionally, since Sacus gave an oral statement to police, we fail to understand how testimony of refusal to write or record a statement would prejudice him further. Additionally, this refusal is probative as to why there is no handwritten or recorded statement by Sacus in the record.
¶ 21. Regarding Griffin cited in Sacus’s brief, we find this case is distinguishable in that it involves accusations of severe pros-ecutorial misconduct where the defendant’s decision not to testify, and thereby exercise his constitutional guarantee not to witness against himself, is mentioned by the prosecutor. Griffin, 557 So.2d at 552. Here, Sacus decided to testify at trial, and the prosecution properly did not comment on Sacus’s invocation of his right to remain silent while he was being examined by Officer Shumpert. Therefore, the trial court did not err in allowing testimony that Sacus refused to make a written or recorded statement. This issue is without merit.
¶ 22. THE JUDGMENT OF THE CIRCUIT COURT OF MONROE COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND PAYMENT OF A FINE OF $5,000, PAYMENT OF $500 TO THE MISSISSIPPI CRIME VICTIMS’ COMPENSATION FUND, AND PAYMENT OF $7,200 IN RESTITUTION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO MONROE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.

. The form both advised Sacus of his Miranda rights and that he had waived these rights. Sacus signed the form acknowledging he had been read his Miranda rights, but he refused to sign the form acknowledging he had waived them.

. The Mississippi Constitution states "[i]n all criminal prosecutions the accused shall ... not be compelled to give evidence against himself; Miss. Const, art. 3, § 25. The Fifth Amendment of the United States Constitution reads "[n]o person ... shall be compelled in any criminal case to be a witness against himself, ...” U.S. Const, amend. V.