# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00366-COA

**DAE'SHON JONES A/K/A DESHAUN JONES A/K/A DADA**                    **APPELLANT**

v.

**STATE OF MISSISSIPPI**                                                    **APPELLEE**

DATE OF JUDGMENT:          02/27/2015
TRIAL JUDGE:               HON. EDDIE H. BOWEN
COURT FROM WHICH APPEALED: JASPER COUNTY CIRCUIT COURT,
                           FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:   LARRY STAMPS
                           ANITA M. STAMPS
ATTORNEY FOR APPELLEE:     OFFICE OF THE ATTORNEY GENERAL
                           BY:  ALLISON ELIZABETH HORNE
DISTRICT ATTORNEY:         CHRISTOPHER DOUGLAS HENNIS
NATURE OF THE CASE:        CRIMINAL - FELONY
DISPOSITION:               AFFIRMED - 12/07/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., McDONALD, LAWRENCE AND EMFINGER, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Dae'Shon Jones was convicted on February 10, 2015, of kidnapping and aggravated assault.  The Jasper County Circuit Court sentenced Jones to serve terms of twenty years for his kidnapping conviction and fifteen years for his aggravated assault conviction in the custody of the Mississippi Department of Corrections (MDOC).  Both sentences were ordered to run consecutively.  Jones filed motions for judgment notwithstanding the verdict and a new trial.  The court denied the motions. Jones appealed.  In his appeal, Jones challenges the sufficiency and the weight of the evidence used against him at trial.

**FACTS AND PROCEDURAL HISTORY**

¶2.    On January 25, 2014, Dimitri Milsap went to Jones's home to pick up his cell phone.[1] Prior to his kidnapping and assault, Milsap had stolen marijuana from Jones.  Upon his arrival, Milsap was bound with duct tape and put in a closet for three hours. After three hours, he was taken out of the closet and put into a bathtub full of hot water. Milsap suffered third-degree burns as a result of being forced to sit in the scalding water.  Milsap escaped when Marketa Moore, another resident of Jones's home, returned from work on the afternoon of January 25, 2014.  When Moore returned home, Jones was not home.  Nathan Jones (Nathan) and Justin Taylor (Taylor) were in the home, though.  They got Milsap out of the bathtub and took him into the living room.  Milsap was still bound.  Moore told them to cut the tape off Milsap, so they did.  Moore went to the back of the house.  Taylor followed her to the back, and Nathan went to the bathroom.  Milsap was left alone in the living room, so he got up and ran away.  Five days later, Milsap could not walk or sit without excruciating pain.  He went to South Central Regional Medical Center in Laurel, Mississippi, where he was treated for first-degree burns.  Milsap then went to Anderson Regional Medical Center in Meridian, Mississippi, where he was diagnosed with third-degree burns.  After his diagnosis, Milsap was rushed to Central Mississippi Medical Center in Jackson, Mississippi, where he stayed for three weeks.  Milsap had four surgeries: two skin graft surgeries and two surgeries to remove staples and padding from the skin grafts.

¶3.    Milsap met with Officer Huey Powe on February 5, 2014, and gave a statement about

---

[1] For the remainder of this opinion, we will refer to the defendant Dae'Shon Jones as "Jones." Any other parties with the same last name will be referred to by their first names.

being held against his will in Jones's home and being forced into a bathtub full of hot water. Milsap did not place Jones at the residence or implicate him in this statement. Milsap gave a second statement on February 27, 2014. Again, Milsap did not implicate Jones, but he did place Jones at the house. Milsap told Officer Powe that Jones came into the house, grabbed a lighter, and left. Powe also interviewed Nathan, whom Milsap named as one of the men who harmed him. In his first statement to Officer Powe on February 2, 2014, Nathan did not implicate Jones. In his second statement to Officer Powe on May 30, 2014, Nathan said that Jones was involved. Specifically, Nathan told Officer Powe that Jones helped kidnap Milsap and was present when Milsap was placed in the bathtub full of hot water.

¶4. On August 4, 2014, Jones, Nathan, and Taylor were indicted for the kidnapping and aggravated assault of Dimitri Milsap. Nathan and Taylor both pled guilty to aggravated assault and kidnapping. Nathan agreed to testify against Jones at Jones's criminal trial in exchange for his plea. Jones's criminal trial began on February 10, 2015. The State alleged that Jones was involved in the kidnapping and aggravated assault of Milsap.

¶5. Milsap was the State's first witness. According to Milsap, on January 25, 2014, he arrived at Jones's home to retrieve his cell phone. When Milsap arrived, Nathan was the only person in the home. Nathan and Milsap smoked marijuana together, and about five minutes later, Jones came through the back door, carrying a gun. Nathan got out two rolls of duct tape and bound Milsap's arms, ribs, wrists, and ankles together. Nathan put Milsap in a closet for three hours. Milsap testified that Jones watched Nathan do this and never told Nathan to stop. Once Milsap was bound, Jones asked Milsap why he had stolen Jones's

3

marijuana.  Jones also pointed a gun at Milsap and said, "What if I shoot you right now?"  Milsap said that Jones laughed when Milsap squirmed in response.

¶6.    Milsap testified that after three hours of being bound in the closet, Nathan took him out of the closet and made him get into a bathtub filled with hot water.  While in the bathtub, Nathan played Russian Roulette with Milsap twice.  Milsap testified that Jones was present the first time Nathan played Russian Roulette.  Milsap said that Jones left while Milsap was in the bathtub.  Milsap never saw Jones again that day.   Milsap testified that he was able to escape when Marketa Moore, one of Jones's roommates, came home from work.

¶7.    Milsap gave Officer Powe two statements about what happened inside Jones's home, and he did not implicate Jones in either statement.   He made his first statement on February 5, 2014, and did not mention Jones.  At trial, Milsap said he did not name Jones in his first statement because he and Jones were "real close friends," and he did not want Jones to be taken from his family. Milsap made a second statement on February 27, 2014.  This time, Milsap said that Jones came into his home, grabbed a lighter, and left.  When questioned about his February 27 statement at trial, Milsap said he lied about Jones's involvement because he "didn't want to see him . . . go down."  Milsap testified that he lied in both of his former statements because he did not want to see his friend go to jail: "[M]e and him, we just real, you know, we real close. We went to school together. In school, we was real close. I didn't want to see him go down . . . ."  Milsap said that the series of events he described in court was the truth.

¶8.    Dominic Wilson also testified for the State.  Wilson stated that on January 25, 2014,

he went to Jones's house to bring Nathan money. When Wilson arrived at Jones's house, Nathan and Jones came to the door and told Wilson that they had Milsap inside. They told Wilson that they were "going to do [Milsap] some harm . . . ." Wilson also testified that Jones told him that he was going to harm Milsap by saying, " I'm going to do him. I'm going to do him." Wilson testified that he saw Milsap in the bathtub.

¶9.     Nathan also testified for the State. Nathan said that Milsap had stolen some marijuana from Jones. A week after Milsap stole the marijuana, he left his phone at Jones's home. Milsap told Jones that he would be coming by Jones's house to retrieve his phone. Nathan testified that he and Jones talked about what they were going to do to Milsap once he got to Jones's home to retrieve his phone. Nathan said it was Jones's idea to duct tape Milsap once he arrived. Nathan testified that on the morning of January 25, 2014, he and Jones saw Milsap walking to Jones's house. As Milsap approached the house, Jones walked out of the back door. When Jones returned, he had a gun, and Milsap began begging. Both Nathan and Jones duct taped Milsap. After they duct taped Milsap and put him in the closet, Jones pointed his gun at Milsap and said, "I'll do you." Nathan testified that Jones was present when Milsap was put into the bathtub of hot water.

¶10.    Nathan was cross-examined about the conflicting statements he gave to Officer Powe. Nathan gave his first statement to Officer Powe on February 2, 2014. Nathan did not mention Jones in that statement. Nathan gave his second statement on May 30, 2014. Initially, Nathan did not name Jones. However, after Officer Powe asked more questions about Jones and mentioned that Nathan had been named but Jones had not, Nathan

implicated Jones. Nathan told Officer Powe that Jones was there when Milsap was put in the hot water.

¶11. Officer Powe testified about the interviews he conducted with Milsap and Nathan. Officer Powe stated that in Milsap's first statement, he did not mention Jones, and in Milsap's second statement, he only said that Jones came in and out of the house. When Powe was asked about his interviews with Nathan, he agreed that Nathan did not name Jones in his first statement. Officer Powe also agreed that Nathan initially did not implicate Jones in his second statement until Officer Powe questioned him more about Jones. However, Officer Powe said he did not force Nathan to incriminate Jones: "I was not trying to get him to say nothing against Dae'Shon if Dae'Shon didn't do nothing. I just wanted . . . the truth. I wanted the ones involved. If they are not involved, I don't want nothing on them." Officer Powe read portions of Nathan's second statement to the jury, which included Nathan's account of what happened on January 25, 2014. Nathan told Officer Powe that he and Jones taped up Milsap, and Jones threatened to kill Milsap.

¶12. The Defense called two witnesses: Moore and Jones. Moore testified that she lived with Jones, his girlfriend Kristin Hicks, and their children in the home where the incident occurred. Moore said that on the morning of January 25, 2014, she and Hicks left for work. She could not recall if Jones was at home when she left for work, but she did know that Jones was not in the car that morning. Moore also testified that she and Hicks did not drop Jones off at his grandmother's house on the morning of January 25, 2014. Moore stated that she returned home from work between 3:00 and 3:30 p.m. on January 25, 2014, and saw Nathan

6

and Taylor in the home. Nathan and Taylor took Milsap into the living room. Milsap was still bound in tape, so Moore told them to release him. Moore noticed a blister on Milsap's foot. After Nathan and Taylor cut the tape off Milsap, Moore went to the back of the home. Taylor followed her while Nathan went to use the restroom. Milsap left the home once all three individuals left the living room. Moore testified that she did not see Jones or know where Jones was on the day of the incident. On cross-examination, Moore testified that Nathan and Taylor were not regular visitors of her home. Nathan had been there twice, and Taylor had never been to her home. She also testified that Nathan and Taylor were not in the home when she and Hicks left for work that morning.

¶13. Jones also testified on his own behalf. On direct examination, Jones testified that he did not know about what happened to Milsap until the police came to his house to execute a search warrant. After the warrant was executed, Jones contacted Milsap to ask what happened, and Milsap told him that Nathan and Taylor had hurt him. Jones denied being a part of the kidnapping and aggravated assault of Milsap. Jones said he left on the morning of January 25, 2014, to go to Hattiesburg, Mississippi, with Justin Jones (Justin). Jones testified that he did not return home until 1:00 or 2:00 a.m. the following morning. Jones also stated that Nathan stayed at the house almost every day, and he used it as his own residence.

¶14. On cross-examination, Jones said that Milsap, Wilson, Nathan, and Moore were lying. Jones said that Moore lied about how often Nathan was at their house. He also claimed Moore lied about who was in the car with her on the morning of January 25, 2014. Jones

7

said he was in the car with Moore and Hicks. He stated that he left with them at 7:00 a.m., and they dropped him off at his grandmother's house. Later that morning, Jones left his grandmother's house to go back to his home and get clothes. Jones left his home before 10:00 a.m. to go to Hattiesburg, Mississippi with Justin for a gang meeting that was being held later that day. Jones said all of this happened before Milsap ever came to his house. Jones's grandparents and Justin did not testify to Jones's alibi.

¶15. On February 15, 2015, Jones was convicted on one count of kidnapping and one count of aggravated assault of Milsap. Jones filed a motion for judgment notwithstanding the verdict and a motion for new trial. The court denied both motions. Jones appealed and challenged the sufficiency and the weight of the evidence used against him at trial.

## ANALYSIS

### 1. Jurisdiction

¶16. Appellate jurisdiction is defined as "[t]he power of a court to review and revise a lower court's decision." *Jurisdiction*, Black's Law Dictionary at 1017 (11th ed. 2019) (defining "appellate jurisdiction"). Without it, this Court must dismiss. *See Smith v. Parkerson Lumber Inc.*, 890 So. 2d 832, 834 (¶¶12-14) (Miss. 2003). The Mississippi Supreme Court has clearly pronounced that Mississippi Rule of Appellate Procedure Rule 4's time limits in which to file a notice of appeal are jurisdictional. *Id*. In most cases, the parties bring the jurisdictional question before this Court. But when they do not, it is incumbent upon this Court to sua sponte resolve jurisdictional issues if they arise. *See id.* (holding that "[r]egardless of whether the parties raise jurisdiction, the Court is required to

8

note its own lack of jurisdiction . . .").

¶17. In reviewing this case, it appears a jurisdictional issue presents itself. The parties did not raise it. Nevertheless, it must be addressed before this Court can consider the appeal on the merits. Mississippi Rule of Appellate Procedure 4(a) requires all notices of appeal to be filed within thirty days "after the date of entry of the judgment or order appealed from." In this case, at first blush, that does not appear to be problematic. As stated previously, Jones filed his notice of appeal on March 24, 2020. The trial court overruled his motion for a new trial on February 24, 2020. The motion for a new trial had been filed of record since February 20, 2015, but for reasons unexplained, not overruled until five years had elapsed. That notice of appeal was certainly within thirty days as required by Rule 4(a).

¶18. However, the Mississippi Rules of Criminal Procedure were adopted and made effective on July 1, 2017. The adopting order entered by the supreme court on December 15, 2016, states the rules "shall govern the procedure in all criminal proceedings in the Circuit, County, Justice and Municipal Courts of this State." Rule 25.3 states:

> A motion for a new trial or a motion to vacate judgment pending thirty (30) days after entry of judgment *shall be deemed denied as of the thirtieth (30th) day* after the motion was filed. However, the parties may agree in writing, or the court may order, that the motion be continued past the thirtieth (30th) day to a date certain within ninety (90) days after the motion was filed; any motion still pending after the date to which it is continued shall be deemed denied as of that date.

MRCrP 25.3 (emphasis added). The question before us becomes, did the new rules of criminal procedure apply to Jones's case at the time of their adoption in July 2017? Jones had already been indicted and tried. Further, Jones's motion for a new trial had already been

9

filed. His motion for a new trial was pending but not yet ruled upon by the trial court when the new rules of criminal procedure came into existence.

¶19. Before the Mississippi Rules of Criminal Procedure were adopted, Uniform Rule of Circuit and County Court Practice 10.05(6) applied, and a motion for a new trial had to be filed within ten days from the date of conviction. URCCC 10.05(6). The thirty-day time limit to file a notice of appeal would not start to run until the trial court ruled on that motion. *See, e.g.*, *Tran v. State*, 915 So. 2d 1129, 1130 (¶4) (Miss. Ct. App. 2005). This old process was changed in July 2017 by Mississippi Rule of Criminal Procedure 25.3. The new rule constructively denies post-trial motions not ruled upon after thirty days. But does that rule apply to cases where the accused was indicted, the defendant was tried, and the post-trial motions were filed all before the new rule? There has only been one case addressing that question.

¶20. In *Thomas v. State*, 314 So. 3d 1181 (Miss. Ct. App. 2021), this Court held that the new rules of criminal procedure do indeed apply. More specifically, this Court held that "Thomas's case before the trial court was not final until the new rules of criminal procedure [(effective July 1, 2017)] provided a rule to finalize his case by operation of law . . . ." *Id.* at 1183 (¶4). Thomas was convicted on October 3, 2006, and filed post-trial motions on October 16, 2006. *Id.* at 1182 (¶1). His motions were never ruled upon. *Id.* Thirteen years later, he filed a motion for post-conviction relief on May 14, 2019, which was almost two years after the Mississippi Rules of Criminal Procedure had become effective but within three years of the constructive denial of his post-trial motions as a result of new rules taking

10

effect. *Id*. at (¶2). Thus, because Thomas's post-trial motions were never ruled upon, and he filed his motion for post-conviction relief within three years of July 2017 (when it was deemed denied pursuant to Rule 25.3), this Court reversed and remanded for the trial court to determine whether Thomas was entitled to an out-of-time appeal. *Id*. at 1185 (¶11).

¶21. In *Thomas*, the defendant filed a motion for post-conviction relief for an out-of-time appeal within the three-year-statutory time bar. *Id.* at 1183 (¶4). In Jones's case, the situation is different because he directly appealed from his conviction after his post-trial motion was formally denied five years after his conviction. We also note that Thomas's post-trial motions were never ruled upon, but Jones's post-trial motion was, albeit five years after the motion was filed.[2] Jones timely appealed from the denial of that motion. In other words, this case presents a unique factual scenario different from *Thomas*. In any event, this Court can clearly see the harsh result that would apply to the select and hopefully small group of inmates who would not have known their times to appeal were running until this Court clearly pointed that out for the first time in April 2021 when we decided *Thomas*. After careful consideration of this rare and unique situation, we find that justice and fundamental fairness requires a suspension of the rules so that Jones may proceed with this direct appeal. *See* M.R.A.P. 2(c). Accordingly, we suspend the rules and allow Jones's appeal to proceed.

### 2. Sufficiency of the Evidence

¶22. Jones argues that the evidence presented at trial was not sufficient to support his convictions of kidnapping and aggravated assault. Jones's motion for judgment

---

[2] Jones's post-trial motion was denied by the trial court by a written order dated February 24, 2020.

notwithstanding the verdict (JNOV) was denied by the trial court. "A motion for JNOV challenges the sufficiency of the evidence presented to the jury." *Sacus v. State*, 956 So. 2d 329, 334 (¶12) (Miss. Ct. App. 2007). This Court reviews sufficiency-of-the-evidence claims de novo. *Clark v. State*, 315 So. 3d 987, 994 (¶7) (Miss. 2021) (quoting *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018)). When determining the sufficiency of the evidence, this Court must ask whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Hearn v. State*, 3 So. 3d 722, 740 (¶54) (Miss. 2008). The evidence is viewed in a light that is most favorable to the State, and the State is given all favorable inferences that can be reasonably drawn from the evidence that was presented at trial. *Henley v. State*, 136 So. 3d 413, 415 (¶8) (Miss. 2014). If a reasonable trier of fact could evaluate all the evidence and find the essential elements of the charged crime to be proven beyond a reasonable doubt, the court will uphold the jury's verdict. *Ronk v. State*, 172 So. 3d 1112, 1129 (¶3) (Miss. 2015).

¶23. Jones was convicted of kidnapping pursuant to Mississippi Code Annotated section 97-3-53 (Supp. 2011). That section provides that an individual who "forcibly seize[s] and confine[s] any other person . . . with intent to cause such person to be confined or imprisoned against his or her will . . . without lawful authority . . ." is guilty of kidnapping. Miss. Code Ann. § 97-3-53. Jones argues that there was insufficient evidence to convict him of kidnapping Milsap.

¶24. At Jones's criminal trial, numerous witnesses testified to his involvement in Milsap's kidnapping. Milsap testified that he came to Jones's house to retrieve his cell phone, and

12

minutes after arriving, Jones emerged from the back with a gun. Milsap stated that Nathan pulled out two rolls of duct tape and bound his arms, ribs, wrists, and ankles with it. Then, Nathan put Milsap in a closet. Milsap testified that Jones watched all this happen, and he never told Nathan to stop. Milsap stated that Jones pointed a gun at him, threatened to shoot him, and laughed at Milsap when he squirmed in fear.

¶25. Nathan testified about Jones's involvement in kidnapping Milsap. Nathan said he and Jones had talked about what they were going to do to Milsap once Milsap got to Jones's house that morning. Nathan stated that Jones walked out the back door when Milsap was approaching, and when Jones returned, he had a gun. Nathan testified that once he and Jones duct taped Milsap, Jones pointed a gun at Milsap's head and threatened to kill him.

¶26. Wilson and Officer Powe also testified about Jones's alleged involvement in the kidnapping of Milsap. Wilson stated that he came to Jones's home on January 25, 2014. When he arrived, Nathan and Jones met him at the door and told him they had Milsap inside. Wilson also saw Milsap inside Jones's home. Officer Powe testified that Nathan told him that he and Jones taped up Milsap, and Jones threatened to kill Milsap.

¶27. The State provided sufficient evidence to prove to a reasonable trier of fact that Jones kidnapped Milsap. Jones held a gun to Milsap's head, helped duct tape Milsap, and put Milsap in a closet to prevent him from escaping. The evidence presented showed that Jones confined Milsap in his home against Milsap's will.

¶28. Jones was also convicted of aggravated assault pursuant to Mississippi Code Annotated section 97-3-7(2) (Supp. 2013), which provides that an individual who attempts

to cause or causes serious bodily injury "purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life" is guilty of aggravated assault. Jones argues that there was insufficient evidence to convict him for the aggravated assault of Milsap.

¶29. Witnesses also testified about Jones's involvement in the aggravated assault of Milsap on January 25, 2014. Milsap testified that after three hours of being held in a closet in Jones's home, Nathan took him out of the closet and made him get into a bathtub filled with hot water. Milsap stated that Nathan played Russian Roulette with him while he was in the bathtub. Milsap said that Jones was present when he was forced into the bathtub and when Nathan played Russian Roulette with Milsap. Milsap testified to the serious injuries he incurred as a result of being forced into the scalding water. Several photographs of the third-degree burns on Milsap's body were introduced into evidence. Milsap also showed the jury his scarring at trial.

¶30. Wilson testified that Nathan and Jones told him they had Milsap in the house, and they were going to "do him some harm . . . ." He stated that Jones said he was going to hurt Milsap: "I'm going to do him. I'm going to do him." Wilson also testified that he could see Milsap in the bathtub when he came into the house to give Nathan some money. Nathan also testified that Jones was present when he put Milsap into the hot water. Nathan also testified that he told Officer Powe that Jones was present when he put Milsap in the bathtub full of hot water.

¶31. The State presented sufficient evidence that could lead a reasonable trier of fact to

convict Jones of aggravated assault of Milsap. Jones watched Nathan place Milsap in the hot water and play Russian Roulette with Milsap. Jones never told Nathan to stop. Jones also told Wilson that he and Nathan were going to harm Milsap. Finally, photographs of the burns were shown to the jury.

¶32.    Jones attempted to establish an alibi through Moore's testimony and his own testimony. Moore testified that on the morning of January 25, 2014, she and Hicks left to drive to work. Moore could not recall if Jones was at the house when she left for work, but she knew that Jones was not in the car with them on the morning of January 25, 2014. Moore stated that when she returned from work, Nathan and Taylor were in her home, but Jones was not in the house. Moore testified that Nathan and Taylor were not regular visitors of her house, and they were not in her house when she and Hicks left for work that morning. Jones testified that he left with Moore and Hicks at 7:00 a.m. on January 25, 2014. Jones said they dropped him off at his grandparents' house. Jones left his grandparents' house and returned to his home to get clothes before leaving with Justin to go to Hattiesburg, Mississippi. Jones said all of this occurred before 10:00 a.m. Jones testified that he was in Hattiesburg all day, and he did not return home until 1:00 or 2:00 a.m. on January 26, 2014.

¶33.    Jones testified that Milsap, Wilson, Nathan, and Moore were lying. He said that Moore was lying about him not being in the car on the morning of January 25, 2014.[3] He also testified that Moore was lying about how often Nathan was at the house, stating that Nathan used Jones's house like his own residence. Jones said he was on his way to

---

[3] Jones called Moore to the witness stand.

Hattiesburg, Mississippi, before Milsap ever came to his home to see Nathan.

¶34.  The jury is the ultimate trier of fact. *Brown v. State*, 764 So. 2d 463, 467 (¶9) (Miss. Ct. App. 2000).  The jury carries the responsibility to "listen to the evidence, observe the demeanor of the witnesses, and decide the credibility of the witnesses and what weight to give any particular piece of evidence." *Id.*  The jury is the "final arbiter of a witness's credibility." *Howell v. State*, 860 So. 2d 704, 731 (¶92) (Miss. 2003) (quoting *Williams v. State*, 794 So. 2d 1019, 1028 (¶59) (Miss. 2001)). "The jury alone determines the weight and worth of any conflicting testimony." *Id*.  In Jones's case, the jury was presented with conflicting testimony.  The jury determined the weight and worth of the conflicting testimony and found that Jones was guilty of the kidnapping and aggravated assault of Milsap.  In reviewing the evidence in a light most favorable to the State, this Court finds that sufficient evidence was presented that could lead a reasonable trier of fact to find that the State proved the essential elements of kidnapping and aggravated assault beyond a reasonable doubt.

### 3.  Weight of the Evidence

¶35.  Jones also argues that the verdict is contrary to the overwhelming weight of the evidence.  Jones filed a motion for a new trial, which the trial court denied.  "A motion for new trial falls within a lower standard of review than does that of a [JNOV] or a directed verdict. A motion for a new trial simply challenges the weight of the evidence." *Lacey v. State*, 310 So. 3d 1206, 1215 (¶22) (Miss. Ct. App. 2020) (quoting *Daniels v. State*, 107 So. 3d 961, 963 (¶12) (Miss. 2013)).  When reviewing a challenge to the weight of the evidence, this Court must determine whether the trial court abused its discretion. *Daniels*, 107 So. 3d

16

at 963 (¶12). When determining if a trial court abused its discretion in denying a motion for new trial, this Court will not act as the "thirteenth juror." *Little v. State*, 233 So. 3d 288, 292 (¶20) (Miss. 2017). The trial court judge is in the "best position to view the trial" because he or she is able to hear the witnesses, observe witnesses' demeanor, and make "far better equipped" findings of fact. *Id.* at 291 (¶18). This Court does not "make independent resolutions of conflicting evidence[,] . . . reweigh the evidence [,] or make witness-credibility determinations." *Id.* at 292 (¶20). That is for the jury to decide. *Id.* This Court will weigh the evidence in the light most favorable to the verdict. *Id.* at 291 (¶21). We will only disturb a verdict when "it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (¶4) (Miss. 2017)).

¶36. As determined above, the jury was presented with sufficient evidence to convict Jones of kidnapping and aggravated assault. After the jury heard all the evidence, weighed the credibility of each testifying witness, and resolved any conflicting evidence, the jury found Jones guilty of kidnapping and aggravated assault. In reviewing the evidence in a light most favorable to the verdict, this Court finds that the jury's verdict was not contrary to the overwhelming weight of the evidence. The trial court did not err in denying Jones's motion for a new trial.

## CONCLUSION

¶37. After review, this Court finds that the evidence was sufficient to convict Jones of kidnapping and aggravated assault. This Court also finds that the jury's verdict was not

17

contrary to the overwhelming weight of the evidence presented. Accordingly, we affirm Jones's convictions.

¶38. **AFFIRMED.**

**WILSON, P.J., GREENLEE, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. BARNES, C.J., CARLTON, P.J., AND WESTBROOKS, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**